Rosemary M. Rivas (SBN 209147)
rrivas@zlk.com
LEVI & KORSINSKY LLP
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE VLADIMIR GUSINSKY REV. TRUST, On Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ULTRATECH, INC, ARTHUR W. ZAFIROPOULO. RONALD BLACK. MICHAEL CHILD. PARAMESH GOPI. BEATRIZ INFANTE. DENNIS RANEY. HENRI RICHARD. VEECO INSTRUMENTS INC. and ULYSSES ACQUISITION SUBSIDIARY CORP., <br><br> Defendants. | Case No. 3:17-cv-1468 <br><br> CLASS ACTION <br><br> **COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> JURY TRIAL DEMANDED |

Plaintiff, by and through its attorneys, alleges upon personal knowledge as to itself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of Ultratech Inc. ("Ultratech" or the "Company") against Ultratech and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on February 2, 2017 (the "Proposed Transaction"), pursuant to which Ultratech will be acquired by Veeco Instruments Inc.

("Parent") through its wholly-owned subsidiary, Ulysses Acquisition Subsidiary Corp. ("Merger Sub," and collectively with Parent, "Veeco").

2.    On February 2, 2017, the Board caused Ultratech to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, stockholders of Ultratech will receive $21.75 per share in cash and 0.2675 of a share of Parent common stock for each Ultratech common share.  Based on Veeco's closing stock price on February 1, 2017, the merger consideration is valued at approximately $28.64 per share.

3.    On March 13, 2017, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.    The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.    This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

**PARTIES**

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Ultratech common stock.

9.      Defendant Ultratech is a Delaware corporation and maintains its principal executive offices at 3050 Zanker Road, San Jose, California 95134.  The Company is a global leader in laser processing, advanced packaging, semiconductor, and nanotechnology industries.   Ultratech's common stock is traded on the NasdaqGS under the ticker symbol "UTEK."

10.      Defendant Arthur W. Zafiropoulo ("Zafiropoulo") is the Chairman of the Board and Chief Executive Officer ("CEO") of Ultratech.    According to the Company's website, Zafriopulo is a member of the Business Development Committee.

11.      Defendant Ronald Black ("Black") is a director of Ultratech. According to the Company's website, Black is a member of the Audit Committee.

12.      Defendant Michael Child ("Child") has served as a director of Ultratech since April 2012.  According to the Company's website, Child is Chair of Compensation Committee and a member of the Business Development Committee and the Nominating and Corporate Governance Committee.

13.      Defendant Paramesh Gopi ("Gopi") is a director of Ultratech.  According to the Company's website, Gopi is a member of the Audit and Compensation Committees.

14.      Defendant Beatriz Infante ("Infante") is a director of Ultratech. According to the Company's website, Infante is a member of the Nominating and Corporate Governance Committee.

15.      Defendant Dennis Raney ("Raney") has served as a director of Ultratech since April 2003.  According to the Company's website, Raney is Chair of the Audit Committee and a member of the Business Development Committee and the Nominating and Corporate Governance Committee.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

16.     Defendant Henri Richard ("Richard") has served as a director of Ultratech since April 2006.  Richard is Chair of the Business Development Committee and the Nominating and Corporate Governance Committee and is a member of the Compensation Committee.

17.     The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18.     Defendant Parent is a Delaware corporation with its principal executive offices located at Terminal Drive, Plainview, New York 11803.

19.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action on behalf of itself and the other public stockholders of Ultratech (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21.     This action is properly maintainable as a class action.

22.     The Class is so numerous that joinder of all members is impracticable.  As of September 30, 2016, there were approximately 26,868,613 shares of Ultratech common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23.     Questions of law and fact are common to the Class, including, among others, whether defendants violated the 1934 Act and whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately

1  protect the interests of the Class.

2      25.    The prosecution of separate actions by individual members of the Class would

3  create the risk of inconsistent or varying adjudications that would establish incompatible standards

4  of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the

5  interests of individual members of the Class who are not parties to the adjudications or would

6  substantially impair or impede those non-party Class members' ability to protect their interests.

7      26.    Defendants have acted, or refused to act, on grounds generally applicable to the

8  Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on

9  behalf of the Class is appropriate.

10  **SUBSTANTIVE ALLEGATIONS**

11  **A.**     **Background of the Company and the Proposed Transaction**

12      27.    Ultratech designs, manufactures, and markets photolithography and laser

13  processing equipment.

14      28.    Founded in 1979, the Company's market-leading advanced lithography products

15  deliver high throughput and production yields at a low, overall cost of ownership for bump

16  packaging of integrated circuits and high-brightness LEDs.

17      29.    A pioneer of laser processing, Ultratech developed laser spike anneal technology,

18  which increases device yield, improves transistor performance, and enables the progression of

19  Moore's Law for 65-nm and below production of state-of-the-art consumer electronics.

20      30.    On July 21, 2016, Ultratech issued a press release wherein it reported its second

21  quarter 2016 financial results. The Company reported revenue of $48.9 million, up 8%

22  sequentially. Additionally, GAAP net income was $2.6 million, up *326%* sequentially. On a non-

23  GAAP basis, Ultratech's net income was $6.3 million, or $0.23 per share, compared to net income

24  of $5.8 million, or $0.21 per share, for the same quarter the prioer year. With respect to the

25  financial results, Individual Defendant Zafiropoulo, Chairman and CEO of the Company,

26

27

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

28

commented:

> Second quarter revenue growth was driven by strong demand for our laser spike annealing, advanced packaging, and inspection product lines. We continue to benefit from positive trends related to the extension of the 28-nm node and the expansion of fan-out packaging technologies to manufacture semiconductor chips. With order momentum and positive leverage in our model, we remain well-positioned to take advantage of the current up-cycle in our industry and anticipate strong growth in the second half of 2016.

31.    On October 20, 2016, Ultratech issued a press release wherein it reported its third quarter 2016 financial results.  The Company reported revenue of $48.6 million, up 47% year-over-year.  On a GAAP basis, Ultratech's net income was $5.5 million, or $0.20 per share, compared to a net loss of $6.1 million, or $0.22 per share, for the same quarter the previous year. On a non-GAAP basis, Ultratech's net income $8.0 million, or $0.29 per share, compared to a net loss of $1.3 million, or $0.05 per share, for the same quarter last year.  With respect to the financial results, Individual Defendant Zafiropoulo commented:

> Our third quarter revenues increased by 47 percent as compared with a year ago, driven by higher sales of our inspection, laser spike annealing, and advanced packaging product lines. As compared with the second quarter of 2016, sales were lower by approximately one percent, due in part to the timing of shipments for our LSA systems which we believe was impacted by the recent typhoons in Taiwan. In the third quarter of 2016, we saw continued strength in sales of our inspection products, which grew by 70 percent in the quarter. Looking ahead, we expect increased sales of our LSA tools as our foundry customers continue to expect an extended 28nm production node.

32.    On February 2, 2017, Ultratech issued a press release wherein it reported its fourth quarter and full year 2016 financial results.  For the fourth quarter, the Company reported revenue of $51.3 million, an increase of 82% year-over-year.  On a GAAP basis, Ultratech's net income was $4.3 million, or $0.16 per share, compared to a net loss of $8.9 million, or $(0.33) per share, for the same quarter last year.  On a non-GAAP basis, net income was $8.4 million, or $0.31 per share, compared to a net loss of $3.9 million, or $(0.14) per share, for the same quarter last year.

33.    Nevertheless, the Board caused the Company to enter into the Merger Agreement,

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

pursuant to which the Company will be acquired for inadequate consideration.

34.    To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Veeco and are calculated to unreasonably dissuade potential suitors from making competing offers.

35.    The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 6.03(a) of the Merger Agreement states:

> (a) Subject to Section 6.03(b), Section 6.03(c) Section 6.03(d) and Section 6.03(f), (i) the Company shall not, and shall cause each of its Subsidiaries and its and their respective officers, directors, employees, investment bankers, attorneys, accountants or other advisors retained by the Company or its Subsidiaries (collectively, "Company Representatives") not to, directly or indirectly, (A) solicit, initiate or knowingly facilitate or encourage the submission of any Acquisition Proposal, (B) enter into or participate in any discussions or negotiations with, or furnish any non-public information or access relating to the Company or any of its Subsidiaries to, any Third Party with respect to an Acquisition Proposal or any inquiry or proposal that could reasonably be expected to lead to an Acquisition Proposal or (C) enter into any agreement in principle, letter of intent, memorandum of understanding, merger agreement, acquisition agreement or other similar agreement relating to an Acquisition Proposal and (ii) except as otherwise provided in this Section 6.03, the Board of Directors of the Company shall not fail to make and shall not withdraw, withhold, qualify or modify, or resolve to or publicly propose to withdraw, withhold, qualify or modify in a manner adverse to Parent, the Company Board Recommendation, or approve, endorse or recommend or publicly propose to approve, endorse or recommend, an Acquisition Proposal (any of the foregoing in this clause (ii), an "Adverse Recommendation Change"; provided, that, for the avoidance of doubt, none of (1) actions contemplated by Section 6.03(a) or 6.03(b), (2) the determination by the Board of Directors in accordance with this Section 6.03 that an Acquisition Proposal constitutes a Superior Proposal or (3) the delivery by the Company of the notices to Parent required by this Section 6.03 shall, in and of itself, constitute an Adverse Recommendation Change). The Company will be liable for any breach of this Section 6.03 by any Company Representatives as if such breach had been committed by the Company. The Company shall immediately cease any discussions or negotiations with any person with respect to an Acquisition Proposal or any inquiry or proposal that could reasonably be expected to lead to an Acquisition Proposal and promptly after the date hereof terminate access to any Third Party or its Representatives to any electronic data room maintained by the Company or its Subsidiaries with respect to the transactions contemplated by this Agreement and request that any such person promptly return or destroy all

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

confidential information concerning the Company and its Subsidiaries to the extent permitted pursuant to a confidentiality agreement with such person. The Company and its Subsidiaries shall not release any Third Party from, or waive, amend or modify any provision of, or grant permission under, (x) any standstill provision in any agreement to which the Company or any of its Subsidiaries is a party or (y) any confidentiality provision in any agreement to which the Company or any of its Subsidiaries is a party except, with respect to clause (x), (A) to the extent that prior to the receipt of the Company Stockholder Approval the Board of Directors of the Company concludes in good faith, after consultation with its financial advisors and outside legal counsel, the failure to take such action would be reasonably likely to result in a breach of its fiduciary duties under Applicable Law or (B) to the extent that any standstill provision in any agreement to which the Company or any of its Subsidiaries is a party includes a "fallaway" or other similar provision that causes such standstill provision to be released, waived, modified or amended as a result of the Company entering into this Agreement in and of itself.

36.     Further, the Company must promptly advise Veeco of any proposals or inquiries received from other parties.  Section 6.03(e) of the Merger Agreement states:

(e) The Company shall (i) notify Parent orally and in writing promptly (but in no event later than forty-eight (48) hours) after receipt by the Company of any Acquisition Proposal, which notice shall identify the Third Party making, and the material terms and conditions of, any such Acquisition Proposal and (ii) keep Parent reasonably informed promptly (but in no event later than forty-eight (48) hours) after any material developments, discussions or negotiations regarding any Acquisition Proposal and shall provide to Parent promptly (but in no event later than forty-eight (48) hours) after receipt thereof of copies of all proposed transaction agreements or proposal letters or similar materials (and any attachments, annexes, exhibits, schedules and other similar materials in connection therewith) sent or provided to the Company or any of its Subsidiaries that describe any material terms or conditions of any Acquisition Proposal.

37.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Veeco a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.03(f) of the Merger Agreement provides:

(f) Notwithstanding anything contained in this Agreement to the contrary, at any time prior to receipt of the Company Stockholder Approval, if the Board of Directors of the Company determines in good faith, after consultation with outside legal counsel and in response to an unsolicited, written, bona fide Acquisition Proposal that did not result from a breach of Section 6.03, that (i) such Acquisition Proposal constitutes a Superior Proposal and (ii) the failure to take such action would be reasonably likely to result in a breach of its fiduciary duties under Applicable Law, then the Board of Directors of the Company may make an Adverse Recommendation Change or cause the Company to terminate this Agreement pursuant to Section 10.01(d)(i) (provided that, substantially concurrently with such

8
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

termination the Company enters into a definitive agreement with respect to such Superior Proposal (a "Company Acquisition Agreement")); provided, that, prior to taking any such action the Company has complied in all material respects with this Section 6.03(f). Further, the Board of Directors of the Company shall not make an Adverse Recommendation Change (or terminate this Agreement pursuant to Section 10.01(d)(i)) pursuant to this Section 6.03(f) in response to an Acquisition Proposal, unless (i) the Company promptly notifies Parent in writing, at least three Business Days before taking such action, of the determination of the Board of Directors of the Company that such Acquisition Proposal constitutes a Superior Proposal and of its intention to take such action, attaching the most current version of the proposed agreement under which such Superior Proposal is proposed to be consummated and the identity of the Third Party making such Superior Proposal (it being understood that each time any material revision or material amendment to the terms of the Acquisition Proposal determined to be a Superior Proposal is made, the initial three (3) Business Day period shall be extended for an additional two (2) Business Days after notification of such material revision or material amendment in accordance with Section 6.03(e) and this Section 6.03(f) to Parent) and (ii) the Board of Directors of the Company (A) shall have considered in good faith and discussed with Parent (if Parent desires to discuss) any adjustments or modifications to this Agreement proposed by Parent and (B) shall have determined in good faith, at the end of the period set forth in clause (i) and after consultation with its outside legal counsel and financial advisor, that such Acquisition Proposal would continue to constitute a Superior Proposal if any adjustments or modifications to the terms of this Agreement proposed in writing by Parent were to be given effect. For the avoidance of doubt, any change to the financial or other material terms of a Superior Proposal shall require a new notice to Parent and a new two (2) Business Day period and discussions process under this Section 6.03(f).

38.     Further locking up control of the Company in favor of Veeco, the Merger Agreement provides for a "termination fee" of $26,500,000, payable by the Company to Veeco if the Individual Defendants cause the Company to terminate the Merger Agreement.

39.     By agreeing to the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

40.     Additionally, certain members of the Company's management and all members of Board entered into support agreements, pursuant to which they have agreed to vote their Company shares in favor of the Proposed Transaction.   Accordingly, such shares are already locked up in favor of the merger.

41.     The merger consideration, valued at $28.64 per share, is inadequate because, among

other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

42.     The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the merger.

43.     The financial analyses performed by the Company's own financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), confirm the inadequacy of the merger consideration.   For example, BofA Merrill Lynch's *Selected Publicly Traded Companies Analysis* yielded implied per share values for the Company as high as $35.90. Additionally, BofA Merrill Lynch's *Discounted Cash Flow Analysis* yielded implied per share values for the Company as high as $31.65.

44.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

45.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

46.      For example, Individual Defendant Zafiropoulo stands to receive over $8.3 million in connection with the Proposed Transaction.  The Company's three other named executive officers stand to receive over $9.3 million.

**The Proxy Statement Omits Material Information, Rendering It False and Misleading**

47.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

48.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

49.     First, the Proxy Statement omits material information regarding the Company's financial projections, Veeco's financial projections, and the financial analyses performed by BofA

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Merrill Lynch in support of its so-called fairness opinion.

50.    The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.  Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

51.    With respect to Ultratech's financial projections, the Proxy Statement fails to provide a reconciliation of all non-GAAP to GAAP financial metrics.  When a company discloses information in proxy materials that includes non-GAAP financial metrics, the company must also disclose comparable GAAP metrics and a quantitative reconciliation of the non-GAAP metrics to GAAP metrics.

52.    With respect to Veeco's financial projections, the Proxy Statement fails to disclose, *inter alia*:  (i) share based compensation; (ii) amortization; (iii) depreciation; (iv) restructuring charges; (v) asset impairment charges; (vi) acquisition related expenses; (vii) other non-recurring items; (viii) interest; (ix) income taxes; and (x) non-cash interest expense on Convertible Notes.

53.    With respect to BofA Merrill Lynch's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:  (i) the terminal values for Ultratech; (ii) BofA Merrill Lynch's basis for applying an illustrative range of perpetuity growth rates of 1.0% to 3.0%; and (iii) the inputs and assumptions used to determine the discount rates ranging from 12.0% to 15.0%.

54.    With respect to BofA Merrill Lynch's *Selected Publicly Traded Companies Analysis*, the Proxy Statement fails to disclose the individual multiples and metrics for the companies observed by BofA Merrill Lynch in its analysis.

55.    With respect to BofA Merrill Lynch's *Selected Precedent Transactions Analysis*,

11
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

the Proxy Statement fails to disclose the individual multiples and metrics for the transactions observed by BofA Merrill Lynch in its analysis.

56.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Certain Unaudited Prospective Ultratech and Veeco Financial Information"; (ii) "Opinion of Ultratech's Financial Advisor"; (iii) "Background of the Merger"; and (iv) "Recommendation of the Ultratech Board; Ultratech's Reasons for the Merger."

57.     Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

58.     Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Ultratech's officers and directors, including who participated in all such communications.

59.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

60.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Interests of Ultratech's Directors and Executive Officers in the Merger" (ii) "Background of the Merger"; and (iii) "Recommendation of the Ultratech Board; Ultratech's Reasons for the Merger."

61.     Third, the Proxy Statement omits material information regarding potential conflicts of interest of BofA Merrill Lynch.

62.     Specifically, the Proxy Statement fails to disclose the amount of BofA Merrill Lynch's fee that is contingent upon consummation of the Proposed Transaction.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

63.    The Proxy Statement further fails to disclose the nature of BofA Merrill Lynch's "material relationships with Ultratech and Veeco" as described in disclosure letters dated November 15, 2016 and January 31, 2017.

64.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

65.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Opinion of Ultratech's Financial Advisor"; (ii) "Background of the Merger"; and (iii) "Recommendation of the Ultratech Board; Ultratech's Reasons for the Merger."

66.    Fourth, the Proxy Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the "process" the directors used in coming to their decision to support the Proposed Transaction.

67.    For example, the Proxy Statement fails to disclose Individual Defendant Zafiropoulo's basis for discontinuing discussions with "Company A" in July 2016, the basis for determining that the Company "would not pursue further discussions with Company A" in August 2016, and whether Company A subsequently attempted to reinitiate discussions with the Company regarding a potential transaction.

68.    The Proxy Statement fails to disclose the nature of the expression of "interest in purchasing selected assets of Ultratech" expressed by a potential strategic acquirer in August 2016, as well as the nature of the apparently similar expression of interest by "Company E" on December 15, 2016.

69.    The Proxy Statement fails to disclose the nature and timing of the previous communications regarding a potential transaction between the Company and "Company F."

70.    Additionally, the Proxy Statement fails to disclose the basis provided by "Company

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

D" for withdrawing its proposal on January 13, 2017.

71.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; and (ii) "Recommendation of the Ultratech Board; Ultratech's Reasons for the Merger."

72.    The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Ultratech's stockholders.

<u>COUNT I</u>

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Ultratech**

73.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

74.    The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Ultratech is liable as the issuer of these statements.

75.    The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

76.    The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

77.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

78. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

79. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

80. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

**Claim for Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants and Veeco**

81. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

82. The Individual Defendants and Veeco acted as controlling persons of Ultratech within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Ultratech and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

83. Each of the Individual Defendants and Veeco was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

84. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the

making of the Proxy Statement.

85.     Veeco also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

86.     By virtue of the foregoing, the Individual Defendants and Veeco violated Section 20(a) of the 1934 Act.

87.     As set forth above, the Individual Defendants and Veeco had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

1  E.  Awarding plaintiff the costs of this action, including reasonable allowance for

2  plaintiff's attorneys' and experts' fees; and

3  F.  Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  March 17, 2017                          **LEVI & KORSINSKY LLP**

By:  *Rosemary M. Rivas*
Rosemary M. Rivas

44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Plaintiff*

**OF COUNSEL:**

Brian D. Long (to be admitted *pro hac vice*)
Gina M. Serra (to be admitted *pro hac vice*)
**RIGRODSKY & LONG, P.A.**
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Telephone: (302) 295-5310

Richard Maniskas (to be admitted *pro hac vice*)
**RM LAW, P.C.**
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
Telephone: (484) 324-6800

17
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934